UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

COUNTESS CLEMONS                    )
       *Plaintiff,*              )
v.                                  )          Case No. 1:11-cv-339
                                    )          *Collier/Carter*
CORRECTIONS CORPORATION             )
OF AMERICA, *et al.*                )
       *Defendants.*             )

_____

G. MICHAEL LUHOWIAK                 )
       *Plaintiff,*              )
v.                                  )          Case No. 1:11-cv-340
                                    )          *Collier/Carter*
TERESA SMITH, *et al.*              )
       *Defendants.*             )


## REPORT and RECOMMENDATION

### I. Introduction

       This matter comes before the undersigned for a report and recommendation concerning the appropriate sanction against Corrections Corporation of America (CCA) for its loss of important video evidence caused by CCA's own grossly negligent conduct.

       Plaintiffs have filed two identical motions for sanctions for spoliation of evidence in the related cases:  [Doc. 44] in *Clemons v. Corrections Corporation of America, Inc.,* 1:11-cv-339 and [Doc. 61] in *Luhowiak v. Smith,* 1:11-cv-340.  Both cases arise from a November 19, 2010 incident in which inmate Countess Clemons went into premature labor sometime in the late afternoon or early evening at the Silverdale Detention Facility (SDF), a correctional facility owned and managed by CCA.  Ms. Clemons was eventually transported to Erlanger Hospital, but her child did not survive.  G. Michael Luhowiak is the administrator ad litem of the deceased child's estate.  Among other claims, plaintiffs bring a claim under 42 U.S.C. § 1983 alleging

1

CCA was deliberately indifferent to her and her child's serious medical needs by failing to act promptly when Ms. Clemons complained of illness on November 19, 2010. Plaintiffs seek various sanctions up to and including default judgment for spoliation of evidence.

## II. Relevant Facts

### A. February 5, 2014 Hearing Regarding the Loss of Video Evidence

The undersigned Magistrate Judge held an evidentiary hearing on the motion for sanctions for spoliation of evidence on February 5, 2014 in which several CCA employees testified.

Steve Groom is and was at all times relevant to this lawsuit the Executive Vice President and General Counsel for CCA, a publically traded company which designs, builds, and manages private prisons for state and federal governments. CCA's legal department is located in Nashville, Tennessee. Mr. Groom received two letters, both dated November 26, 2010, from Lance T. Weber, General Counsel of the Human Rights Defense Center, stating that his office had been retained to represent Ms. Clemons in connection with the death of her child and asking that CCA preserve evidence. (*See* Plaintiff's Exhibits 1 and 2.) In one letter in particular, Mr. Weber specifically requested that CCA retain all video made by any cameras in the SDF that depict Ms. Clemons anywhere on the property during the 24 hour period immediately preceding her transport from the SDF to the hospital on November 19, 2010 and all video made by any cameras in the SDF of any persons acting on Ms. Clemons' behalf or discussing Ms. Clemons' medical condition prior to her transport to the hospital. (Plaintiff's Ex. 2). The letters were forwarded to the CCA lawyer assigned to the SDF who, pursuant to normal CCA protocol, would have notified the SDF to preserve the requested video. According to Mr. Groom, CCA has a documents retention policy which requires all potential evidence to be preserved.

2

Paul L. Jennings is and was at all relevant times the warden at SDF. He also testified that there is a policy to preserve evidence at CCA and when any request for evidence is made, a file is developed and the evidence is placed in it. Warden Jennings received an email with an attachment, the letter from Lance T. Weber of the Human Rights Defense Center requesting that the video evidence from November 19, 2010 be preserved. Very soon after receiving the email, Jennings contacted Assistant Warden Quinn and assigned him the task to obtain and copy the video evidence. Quinn assigned John Kerns, part-time maintenance worker and part-time IT staff, to copy the requested video from November 19, 2010. It was Warden Jennings' understanding that Kerns did copy the requested video from November 19, 2010.

SDF uses the Pelco camera system which does not provide any audio. All video is, however, time stamped. At the time at issue, Clemons was housed in the Alpha section of SDF. The Alpha section is comprised of four pods or separate dorms which branch off in four symmetrical directions from a center post, called the Alpha post. The Alpha post is a large six sided desk. On the night in question Nurse Badger was stationed as the Alpha post officer. Clemons was housed in pod 3. There is a camera in Alpha pod three which provides a sweeping view of the bunks and table area. It does not provide a direct view of the exit door; the bathrooms and showers; or the pill call area, the station where the nurse dispenses medicine to the inmates; but it would show whether someone walked toward or away from those areas. Thus, if Clemons had been assisted from her bunk toward the bathroom or shower area, that would be shown on the video. The video would also show a corrections officer moving from the entrance door toward the bunk area or bathroom and shower area.

Another camera shows a view looking down a long hallway toward the large circular Alpha post desk. If a person walked up to the Alpha post desk, that person would be seen on the

3

video though it may be difficult to ascertain the person's identity given the distance of the Alpha post desk from the camera located down the hallway. Looking in the direction of the Alpha post desk, about halfway down the hallway on the left side is the entrance to the Receiving and Discharge (R&D) area. The camera view does not show inside the R&D area or the entrance door. It would show someone coming down the hall and turning into the R&D area, however.

There is also a camera located in the R&D area which provides a broad view of the R&D: the center reception and desk area, the entrance door, and the entrance to cells 1 and 2 are within the view of this camera. The cell doors to cells 3, 4, and 5 are not on camera, but video would show if someone left the reception area and walked toward those cell doors. When Ms. Clemons was brought to R&D the evening of November 19, 2012, she was placed in cell 3.

Finally, there is a camera focused on the door of SDF through which ambulance personnel would have entered and Clemons would have exited to reach the ambulance.

On November 23, 2010, Ms. Quinn filed a grievance alleging she did not receive timely medical care thereby causing the death of her child. Warden Jennings assigned the grievance to Assistant Warden Quinn who immediately viewed the Pelco video from November 19, 2010 as part of his investigation. Quinn concluded that staff had not acted with malfeasance and denied the grievance. Ms. Clemons appealed the finding to Jennings who denied her appeal without further investigation because he felt that Quinn's decision had adequately addressed Clemons' arguments.

On November 23, 2010, SDF conducted a morbidity case review of the November 19, 2010 incident and found "[t]he Medical Staff documented very poorly on this inmate" and "[t]he Medical Transport should have been more timely." (Plaintiff's Ex. 9, p. 2)

Michael T. Quinn was the Assistant Warden at SDF during all times relevant to this lawsuit. On Friday, November 19, 2010, he worked a normal shift and left SDF about 6 pm. While en route to his home, he received a call reporting that Ms. Clemons needed a "nonemergency transport" to the hospital. As the events giving rise to this lawsuit unfolded on November 19, 2010, Quinn remained in frequent contact with staff at SDF and spoke to a doctor at Erlanger to keep informed. The following day, Quinn went back to SDF to review the video tapes from the previous day and to take statements from staff regarding the incident. He also made plans to allow Ms. Clemons a contact visit with her family and a furlough to attend her child's funeral. He also prepared the Notification to Administration of the incident occurring on November 19, 2010. (Plaintiff's Ex. 10). The Notification to Administration contains a "Description of Incident" which was written by Quinn following his investigation. This "Description of Incident" contains a timeline of events which Quinn testified he prepared based entirely on his review of the video tapes within the facility. Quinn testified at the evidentiary hearing before the undersigned that he reviewed the relevant video "a lot of times."

Quinn participated in the morbidity review of the November 19, 2010 incident. He testified that he signed the Morbidity Review solely to indicate that he was involved in the review but that he did not agree with the assessment that "[t]he Medical Transport should have been more timely." He testified he thought Ms. Clemons' situation had been handled properly and he testified he based this conclusion in no small part on what he saw on the video tapes. In particular, he mentioned at the February 5, 2014 evidentiary hearing that the video showed Ms. Clemons being rolled in a wheelchair from the pill call area down the hallway to R&D and there did not appear to be an emergency. Further, according to Quinn, other video did not show staff responding as if there were an emergency.

Quinn remembers receiving a letter from Clemons' lawyer asking for the relevant video. When he was asked to preserve the relevant video, he asked CCA employee Kerns to make a copy. Kerns was a part-time maintenance worker and IT worker. Quinn wrote down on a piece of paper the date and time frames for the video and which camera views he wanted copied. Kerns had made video copies for him before, and he felt he had no reason not to trust Kerns to copy the correct video. Later, Kerns told Quinn he had completed the copying. Quinn did not check the copies to make sure it was the correct video. In June 2011, the CCA attorneys asked to see the video of the incident, and Quinn discovered then for the first time that Kerns had copied video from November 18, 2010, not the necessary video from November 19, 2010. The Pelco video system overwrites all video every ninety days; therefore, the relevant video had been overwritten. Nevertheless, Quinn contacted the Nashville central office to see if the video might still be recovered, and he was told it could not be.

Quinn testified at the evidentiary hearing that the Pelco video system is fairly complicated. Each camera, which records to a separate DVR, has to be logged into individually and logged out of before going to the next camera. Quinn testified he walks through the facility on a regular basis and it is not unusual for inmates to come up to him and complain or ask him questions.

*B. The Events of November 18 and 19, 2010*[1]

On November 18, 2010, plaintiff Countess Clemons was nineteen weeks pregnant. *Depo. of Clemons pg. 67-68, Doc. 75-3.* That day, she began experiencing pain in her lower stomach. *Id. at 71-73.* She went to see defendant Nurse Smith at pill call, and she told Nurse Smith that her stomach was hurting "real bad." *Id.* Nurse Smith told her not to worry, her uterus was just stretching. *Id.* The pain continued to worsen during the night and she did not sleep well. *Id. at 79.* The pain continued throughout the next day, November 19, 2010. The most comfortable position for her was rolled into a ball. *Depo. of Clemons, pg. 74.* Early on November 19, 2010, when the plaintiff used the bathroom, she noticed a small amount of blood when she wiped. *Id. at 79.* Sometime between 5 pm and 6 pm, plaintiff could tolerate the pain no longer, and she sent inmate Christa Chubb to get Corrections Officer Brenda Badger. *Id. at 74-75; Depo. of Badger, pg. 62, line 23 – pg. 63, line 2; pg. 65, line 19 – line 22.* Plaintiff was throwing up, and other inmates were beating on the windows of the unit to try to get someone to come help her. *Depo. of Clemons, pg. 75, 78-79.* Defendant Badger entered the dorm area and discovered that Ms. Clemons was in the bathroom sitting on the toilet and suffering from stomach pain. *Badger Depo. pg. 65, line 19 – pg. 66, line 17.* According to Badger's testimony, within five minutes of finding Ms. Clemons on the toilet and complaining of stomach pain, Badger informed Defendant Teresa Smith, LPN ("Nurse Smith"), the nurse working at SDF in the Alpha Unit, that Ms. Clemons had abdominal pain. *Badger Depo., pg. 72, line 18 – line 23. See also, Depo. of*

---

[1] The recitation of facts in this section of the report and recommendation is not intended to be a recommended finding of facts of the events on November 18 and 19, 2010. Rather, the purpose is to focus on facts as alleged by the parties and on the important differences in the parties' versions of events occurring on November 19, 2010 because the allegations themselves as well as the differences are relevant to the importance of the lost video tapes. For each fact, the undersigned provides a source. Each fact set forth in this section is the assertion of the source from which it comes – it is not the undersigned's finding.

7

*Clemons, pg. 75, line 5 – line 10.* Nurse Smith responded to this information by stating that Ms.

Clemons was "probably constipated." *Badger Depo. pg. 73, line 25 – pg. 74, line 9; pg. 74, line*

*22 – pg. 75, line 24.* Badger testified that Nurse Smith did not leave pill call to evaluate Ms.

Clemons. *Badger Depo. pg. 75, line 23 – pg. 76, line 6.* When Badger returned from pill call,

inmates were beating on the windows asking her, "did you tell the nurse?" *Depo. of Badger, pg.*

*72-73.*

      Prior to leaving work at the end of Badger's shift, inmates in the dorm with Ms. Clemons

informed Badger that Ms. Clemons was having more difficulties and was spotting (bleeding).

*Depo. of Badger, pg. 82, line 3 – pg. 83, line 16.* Badger testified at her deposition that she

informed Nurse Smith about Ms. Clemons bleeding on her way out at the end of her shift. *Id.*

Defendant Badger also testified that she informed Defendant Juanita Montgomery, a corrections

officer whose shift began immediately after Defendant Badger's, about the complaints and

condition of Ms. Clemons. *Depo. of Badger, pg. 82, line 3 – line 7.*

      Defendant Montgomery stated that upon coming on duty she was summoned by an inmate in

the same dorm as Ms. Clemons. *Depo. of Montgomery pg. 51, line 1 – line 6.* Defendant

Montgomery does not recall how much time elapsed from the time that her shift started until the time

that she was summoned by an inmate concerned about Ms. Clemons. *Id. pg. 52, line 6 – line 9.* After

entering the dorm and checking on Ms. Clemons, Defendant Montgomery and another inmate

assisted Ms. Clemons, who was crying a little and hurting "real bad," in walking to the pill call area

to see Nurse Smith. *Id. pg. 52; 53, line 23 – pg. 54, line 12.*

      Nurse Smith was working in the Alpha Unit of SDF on November 19, 2010, and has given

testimony that is directly contradictory to that of Defendant Badger regarding Ms. Clemons.

According to Nurse Smith, neither Defendant Badger nor anybody else, other than the plaintiff

herself, ever informed her about Ms. Clemons experiencing abdominal pain or bleeding on

November 19, 2010. *Depo. of Teresa Smith, pg. 89, line 8 – line 12; pg. 106, line 18 - line 22; pg. 108, line 10 – line 22.* Nurse Smith further testified that she was first aware of any medical issues with Ms. Clemons when Ms. Clemons herself came to the pill call area where she (Smith) was working at approximately 7:30 p.m. *Id. at pg. 108, line 16 – line 22.* According to Smith, plaintiff reported to Nurse Smith that she was experiencing a non-bloody discharge. *Depo. of Smith at 113.*

After talking to Ms. Clemons in pill call about her symptoms, Nurse Smith contacted the CCA on-call provider, physician assistant Robert Stultz. *Depo. of Smith, pg. 113, line 5 – line 8; Declaration of Stultz, Ex. 17.* Stultz ordered that Ms. Clemons be transported out of the facility. *Id. at 113, line 16 – line 18.* Nurse Smith testified that she completed a Medical Transport Form at 7:43 p.m. with Ms. Clemons in pill call. *Id. at 115, line 16 – pg. 116, line 1.* Nurse Smith also testified that she took Ms. Clemons to R&D in a wheelchair and that the paperwork was ready to get Ms. Clemons transported. *Id. at 115, line 20 – pg. 116, line 4; pg. 114, line 22-23; pg. 117, line 15 – line 25.*

Nurse Smith's testimony conflicts with testimony from corrections officer Daniel Garcia ("Defendant Garcia") regarding who brought Ms. Clemons to R&D. Defendant Garcia was the officer working in the R&D unit on November 19, 2010. He testified that Ms. Clemons was brought to R&D by Montgomery at 7:32 p.m. *Depo. of Garcia, pg. 33, line 2 – line 18.* Plaintiff also testified Montgomery brought her to R&D in a wheelchair. *Depo. of Clemons, pg. 77.* Ms. Clemons was placed in cell 3 in the R&D unit. *Depo. of Garcia, pg. 30, line 21.*

Ms. Clemons testified that before she arrived at R&D, her water had broken and that while in the cell in R&D, she suffered from severe vaginal bleeding, abdominal pain and contractions. *Depo of Clemons. pg. 81, line 3 – pg. 82, line 14.* According to Ms. Clemons, the next time she noticed vaginal bleeding on November 19, 2010, after seeing some blood in the bathroom that morning, was when she was in the cell in R&D. *Depo. of Clemons pg. 82-83.* She

crawled to the cell door and beat on the bottom pleading for help. *Id. at 82.* Ms. Clemons also testified that Garcia never came to help her while she was in R&D. *Id.*

Garcia has testified that he had a conversation with Ms. Clemons while she was standing in the cell, about her requests to see the nurse after being brought to R&D. *Depo. of Garcia, pg. 41, line 17 – pg. 43, line 20.* Garcia did not recall when this conversation occurred in relation to when Ms. Clemons arrived in R&D. *Depo. of Garcia, pg. 44, line 3 – line 18.* According to Ms. Clemons, she pleaded with CCA staff member Garcia for help, who then advised Ms. Clemons that the staff at Silverdale were conducting a "count" and responding to "codes," and Garcia did not take any action to provide Ms. Clemons with medical treatment. *Depo. of Clemons, pg. 81, line l9 – pg. 82, line 6.*

After Ms. Clemons was placed in the cell in R&D, a code red (inmate attack on an officer) was called at 8:03 p.m. in another part of SDF. *Depo. of Montgomery, pg. 71, line 10 – line 11.* At some point while Ms. Clemons was in the R&D cell, her pants became wet and soaked in blood, she was crying and moaning in pain, and Defendant Montgomery brought her a new pair of pants. *Depo. of Clemons, pg. 82, line 7 – 10.* Defendant Montgomery testified that she brought Ms. Clemons a change of pants, but is not sure what time that occurred. *Depo. of Montgomery, pg. 63, line 18 – pg. 67, line. 2.* Defendant Montgomery also testified that the video footage would be able to identify what time she entered the cell in R&D and provided Ms. Clemons with a change of pants and when she exited the cell and disposed of the pants Ms. Clemons had been wearing and were soaked with blood. *Id.*

After the code red at SDF, Ms. Clemons had yet to be transported to the hospital. Once Defendant Montgomery was finished responding to the code red, she returned to R&D and found that Ms. Clemons had yet to be transported to the hospital. *Depo. of Montgomery, pg. 60, line 21 -pg. 61, line 25.* At that point, according to Nurse Smith, Defendant Montgomery called Nurse Smith, who

10

was back in the Alpha pill call room, and advised Nurse Smith that Ms. Clemons was bleeding. *Depo. of Smith, pg. 133, line 20 – pg. 135, line 4.*  Nurse Smith testified that she ran from the pill call room to R&D. *Depo. of Smith, pg. 138, line 11 – line 15.*  After arriving at R&D and opening Ms. Clemons' cell door, Nurse Smith noticed blood and saw Ms. Clemons lying on the bench in the cell. *Depo. of Smith, pg. 138, line 21 – pg. 139, line 6.*  At that point, Nurse Smith directed other CCA staff to call 911. *Depo. of Smith, pg. 139, line 17 – line 19.*  Nurse Smith does not recall what time this occurred. *Depo. of Smith, pg. 140, line 1 – line 8.*  However, Defendant Montgomery testified that she and Nurse Smith went to R&D after the code at the same time. *Depo. of Montgomery, pg. 62, line 9 – pg. 64, line 2.*  Defendant Montgomery does not recall what time this occurred, but has testified that the video footage would indicate the time. *Depo. of Montgomery, pg. 66, line 15 – pg. 67, line 2.*

Hamilton County Emergency Medical Services providers arrived at SDF at approximately 9:46 pm, left for Erlanger Hospital with the plaintiff at approximately 10 pm, and arrived at Erlanger Hospital with the plaintiff at approximately 10:26 pm.  *EMS 0001-5, Doc. 57-9.*  Sometime after plaintiff's arrival at Erlanger, she miscarried.

### III. Analysis

A federal court applies federal law when determining whether sanctions should be imposed for spoliation of evidence.  *Id.* at 553 (citing *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009).  A district court's imposition of sanctions for spoliation will be reviewed by the court of appeals for abuse of discretion.  *Id.*  The Sixth Circuit in *Beaven v. United States Dep't of Justice*, 622 F.3d 540 (6th Cir. 2010) set forth in comprehensive fashion the framework and standards required to impose sanctions for spoliation.  Before sanctions can be imposed, three requirements must be established:

(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind";

11

and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Beaven*, 622 F.3d at 553 (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir.2002)).  The party seeking the imposition of sanctions bears the burden to prove these three requirements.  *Bryd v. Alpha Ins. Corp.*, 518 F. App'x 380, 383-84 (6th Cir. 2013); *Pollard v. City of Columbus*, 2013 WL 5334028 *5 (S.D. Ohio Sept. 23, 2013).

### Duty To Preserve Evidence

An obligation to preserve evidence exists when the party should have known that the evidence may be relevant to future litigation.  *Beaven*, 622 F.3d at 553.   Ms. Clemons' counsel specifically requested CCA to preserve this evidence within one week of the events giving rise to this action.  CCA concedes it had an obligation to preserve the video evidence at issue.

### Culpable State of Mind

The culpable state of mind factor can be established by conduct ranging from negligent to intentional conduct.  *Id.* ("[T]he 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or *negligently*.' ") (brackets original, emphasis original) (quoting *Residential Funding Corp.*, 306 F.3d at 108)).

CCA states it "may have been negligent in its loss of the video."  *CCA's response to motion for sanctions, Page ID # 1519*.  Plaintiffs assert the evidence establishes the loss of video was intentional.  Plaintiffs note that defendants had ample notice within a week's time that the video should be preserved and ninety days thereafter to check and ensure that the proper video had been preserved.  Plaintiffs also point to the fact that in November 2010, SDF conducted a morbidity review in which Assistant Warden Quinn participated, and this morbidity review

12

found that SDF did not act in a timely manner regarding Clemons' medical needs.  Further, on November 23, 2010, Clemons filed a grievance related to the events of November 19, 2010. Quinn investigated and reviewed the grievance and relied heavily on the video to deny it. According to plaintiffs,

> the denial of Ms. Clemons' grievance while finding a delay in transporting Ms. Clemons to the emergency room during the Morbidity Review illustrates that that CCA intentionally withheld evidence from Ms. Clemons about this incident during the grievance process. Plaintiffs submit that these actions create a strong inference that CCA intentionally failed to preserve the video evidence because it would be detrimental to CCA as CCA acknowledged the delay in transporting Ms. Clemons during its own Morbidity Review.

*Plaintiffs' reply brief, 1:11-cv-339, Page ID # 1566*.

The undersigned accepts neither sides' evaluation of CCA's culpable state of mind instead concluding that CCA's state of mind lies closer to recklessness than mere negligence or intentionality.  There are several factors which lead the undersigned to this conclusion.  In finding that CCA's conduct was not intentional, I accept Assistant Warden Quinn's testimony that he requested the video from November 19, 2010 be saved and that the failure to save the correct day was unintentional.

In finding that CCA's conduct was more than simply negligent, I rely on the following factors: first, there was no delay in the request for the video tapes and the appropriate people were notified it should be preserved.  Clemons' counsel sent two letters within one week of the incident at issue to CCA's General Counsel, Steve Groom, asking that the video be preserved. Groom emailed SDF Warden Jennings shortly thereafter with a copy of the letters attached informing Jennings to preserve the video.  Jennings assigned the task of preserving the video to Assistant Warden Quinn.

13

Second, Quinn knew how important the video was in determining what happened to Clemons on November 19, 2010: he testified at the evidentiary hearing before the undersigned that he viewed all the video himself multiple times, a difficult task given how the video was stored in the Pelco system, and relied on it heavily to determine that Clemons' grievance alleging malfeasance in failing to provide her adequate and timely medical care should be denied. In fact, at the February 5, 2013 evidentiary hearing before the undersigned, Quinn testified he determined Clemons was not in an emergency situation when being wheeled from her pod to R&D because the staff did not look upset or concerned—a conclusion based on what Quinn saw on the video. Thus the undersigned concludes CCA knew the video was a key piece of evidence in the case.

Third, the gravity of the event in question naturally demanded significantly more care and attention to the preservation of the video evidence than was given. In the incident at issue, a death occurred. It is an extremely serious matter deserving meticulous effort to insure the relevant evidence is preserved. Instead, Quinn assigned the collection and preservation of the video (after he himself had viewed the video repeatedly) to a part-time maintenance worker/IT person. This does not inspire the undersigned's confidence in the seriousness with which SDF took the preservation request. Further and more importantly, even though Quinn, Jennings, and their lawyers were aware that the video on the Pelco system was taped over every 90 days, they made no efforts during the 90 day period to confirm that the correct video had been preserved. CCA was cavalier in its efforts to preserve the video at issue.

Based on the three factors discussed above, the undersigned concludes CCA's conduct constitutes more than negligence but less than intentional conduct; it was gross negligence. Gross negligence has been defined as, "[s]uch entire want of care as would raise a presumption

of conscious indifference to the consequences." *Livingston v. High Country Adventures, Inc.*, 156 F.3d 1230, *3 (6th Cir. July 30, 1998) (quoting *Craig v. Stagner*, 159 Tenn. 511, 19 S.W.2d 234, 236 (Tenn.1929) (*abrogated on other grounds by McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn.1992)). *See also, Helton v. Reynolds,* 640 S.W.2d 5, 10 (Tenn.Ct.App. 1982) (Gross negligence is indicated by a conscious neglect of duty or a callous indifference to consequences.) Assigning the preservation of the video to a maintenance worker with some IT duties and then failing to take steps during an entire 90 day period following the death of Clemons' child to ensure that the proper video had been preserved constituted callous indifference to CCA's duty to preserve important evidence in this case.

### *Relevance of the Video Evidence*

CCA has raised a number of arguments as to why it believes the video at issue is not relevant to this case for purposes of spoliation sanctions. First, CCA argues, plaintiffs can call inmates as witnesses to testify as to what happened and when it happened on November 19, 2010, and, therefore, the video is not necessary. Second, plaintiffs cannot *prove* that the video would have been helpful to them. Third, plaintiffs have not been prejudiced by the loss of the video because the video shows very little of the SDF. Fourth, because plaintiff cannot prove all the elements of her claims, the video is irrelevant.

There is no doctrine within the Sixth Circuit holding that spoliated evidence is only relevant if it was the only evidence a party could have used to prove her claim or defense. In fact, at least one court within the Sixth Circuit has specifically rejected this argument. *See Pollard v. City of Columbus*, 2013 WL 5334028 *5 (S.D. Ohio Sept. 23, 2013). In *Pollard*, the plaintiff's son was shot and killed by police while driving a vehicle, and the vehicle was riddled with bullet holes. Plaintiff brought an action under 42 U.S.C. § 1983 for the death of her son.

15

Police impounded the vehicle in which the son was killed and, despite a request to hold the vehicle, it was later destroyed. The *Pollard* court stated, "[a]lthough Defendants have exhaustively listed alternative sources of evidence that the Plaintiff might employ in its case, that is not the proper inquiry. Rather Circuit precedent requires only that the evidence be 'relevant' to a claim or defense." *Id.* at *5 (citing *Beaven*, 622 F.3d at 553). Instead, the *Pollard* court found "[a] reasonable trier of fact could find that an opportunity to further examine and inspect the vehicle itself would support the claims asserted by the Plaintiff." *Id.* The undersigned finds *Pollard* to be persuasive; even though inmates and Clemons can testify as to the events in question, the video is still very relevant to the issues in this case. Plaintiffs are correct that inmate witnesses, because they are inmates convicted of crimes, will not carry the same credibility that a corrections officer would. A video tape of events with a time stamp is a highly useful tool in determining what happened and when it happened.

Nor is there a requirement within the Sixth Circuit that the party seeking sanctions show the spoliated evidence *would* support her claim. Rather, the movant for sanctions need only show that the spoliated evidence *could* have been useful to her claim. *Jones v. Staubli Motor Sports Division,* 897 F.Supp.2d 599, 609 (S.D. Ohio 2012). In *Jones*, the plaintiff brought a claim against the defendant manufacturer alleging a race car refueling device had a manufacturing defect which caused his burn injuries. The manufacturer lost the refueling device; thus, plaintiffs experts never had the chance to examine it and "assess whether there was a specific defect present in the product that may have caused it to fail on the day of the accident." *Id.* at 609. The manufacturer argued Jones was not entitled to sanctions for spoliation because Jones could not show the lost device would have been beneficial to his case. The *Jones* court soundly rejected this argument:

Though Staübli argues that Jones has failed to show that the missing SAF [refueling devices] would have been "favorable" to his case, this Court disagrees with the notion that Jones necessarily has to show this to be entitled to an adverse inference instruction. Staübli cites *In re Nat'l Century* for this proposition ( *see* 2009 WL 2169174 at *12), but the Court notes that the Sixth Circuit in *Beaven* has since described the third prong differently, requiring only that a party show that a reasonable trier of fact *could* find that the missing evidence would support that party's claim. *Beaven* at 553. In a case like this, where a defendant manufacturer has lost or destroyed the very product at issue in a products liability case, a reasonable trier of fact could find that the missing evidence could support the party's claim simply by virtue of the fact that the trier of fact could have found the presence of a manufacturing defect had the product been preserved. The Court rejects Staübli's approach, at least as it pertains to circumstances such as that present here, for it has the real potential of giving a defendant manufacturer an inherent advantage in litigation by having destroyed the very product alleged to have been defective.

*Id.* at 609 (emphasis original). *See also Byrd v. Alpha Alliance Ins.*, 518 Fed.Appx. 380,385 (6th Cir. Mar. 26, 2013) (holding oven was "relevant" to Alpha Alliance's claims or defenses where "fire originated from the oven, and Bryd's destruction of the glass top range impaired Alpha Alliance's determination of the fire's precise cause."); *Wiseman v.* Lipinski, 2012 WL 928739 *3 (M.D. Tenn. Mar. 19, 2012)(holding motor part destroyed by defendant was "relevant" for purposes of spoliation sanctions based on allegation in plaintiff's lawsuit that defendant had improperly maintained the part thereby causing plaintiff to have an accident resulting in her injuries); *Coach, Inc. v. Dequindre Plaza, L.L.C.*, 2013 WL 2152038 *13 (E.D. Mich. May 16, 2013) ("relevance in [the context of sanctions for spoliation] includes evidence which would naturally have been introduced into evidence.") (internal citations omitted) (brackets added).

In the instant case, video on November 19, 2010 of the pod where Clemons was housed, of the hallway from the pod to R&D, and inside R&D itself would be evidence "which would naturally have been introduced into evidence" at trial. While the video from those areas did not have audio and would not have shown everything that occurred in those areas, it would have shown a number of important matters and given a time stamp for each of them. For example, it

would have shown whether and when Clemons was assisted through the pod's main room toward the bathroom, whether and when Badger went toward the bathroom in the pod, whether and when inmates were beating on the pod windows trying to secure help for Clemons, whether and when Badger went toward the pill call area where Nurse Smith was stationed, who wheeled Clemons to R&D and when, the demeanor of staff and Clemons at the time Clemons was being rolled down the hall to R&D, and whether Garcia ever approached that side of the cell area where Clemons was being housed in R&D. All this information would have been helpful in assessing the seriousness of Clemons' distress, when staff was informed of Clemons' distress, and the timeliness of the SDF staff's reactions to it -- issues which are key to the question of whether SDF staff acted with deliberate indifference to a serious medical need. Moreover, CCA's insistence in its briefing that the video would not be useful to the plaintiff because it had no audio and only a limited view of the facility is particularly unpersuasive given Assistant Warden Quinn's testimony that he viewed the video over and over and relied on it heavily in determining that Clemons' grievance should be denied.

CCA also argues that the video evidence cannot show that CCA had a custom, policy, or pattern and practice of deliberate indifference to the serious medical needs of inmates, thus the video is irrelevant. However, the Sixth Circuit has no requirement that evidence must be relevant to every element of a particular claim before sanctions can be awarded for its spoliation. *See e.g.*, *Wiseman v. Lipinski,* 2012 WL 928739 *3 (M.D. Mar. 19, 2012) ( holding that because the plaintiff could not prove one element of his claim due to spoliation of evidence, plaintiff was entitled to an adverse inference against the defendant). As previously discussed, the video evidence at issue could have provided valuable information regarding the seriousness of plaintiff's condition, when the defendants became aware of plaintiffs' condition, and when

defendants took action regarding defendants' condition.[2]  Based on all the reasons stated above, the undersigned concludes the video evidence was relevant for purposes of spoliation sanctions.

### *The Purpose of Sanctions*

Imposing sanctions for spoliation of evidence has two purposes: (1) "leveling the evidentiary playing field" and (2) "sanctioning improper conduct."  *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009); *see also Beaven*, 622 F.3d at 544 ("a proper spoliation sanction should serve both fairness and punitive functions.") (quoting *Welsh v. United States*, 844 F.2d 1239, 1246, (6th Cir.1988), *overruled on other grounds by Adkins*, 554 F.3d 650)).  The sanction chosen should be no more than is necessary to level the evidentiary playing field and correspond to the spoliator's degree of culpability after a "fact intensive inquiry into the party's degree of fault under the circumstances."  *Beaven*, 622 F.3d at 554; *accord*, *Bryd*, 518 Fed. Appx. at 385-86; *Freeman v. Collins*, 2014 WL 325631 *6 (S.D. Ohio Jan. 29, 2014).  Sanctions may range anywhere from instructing a jury that it may infer a fact based on lost or destroyed evidence to granting summary judgment.  *Beaven*, 622 F.3d at 554; *Bryd*, 518 Fed. Appx. at 385-86.

The undersigned observes that, as a practical matter, imposing sanctions in this action may be somewhat problematic because sanctions should not be imposed against the individual defendants, only CCA.  Plaintiff concedes that the individual defendants should not be sanctioned for loss of the video because they did not have control over the video while CCA as an institution did.  However, there is precedent for imposing sanctions on one defendant while

---

[2] CCA also makes a number of other arguments which are akin to a motion for summary judgment to assert no sanction should be applied.  Whether these actions will be able to withstand actual motions for summary judgment is a matter for the district court to decide.  It is not an issue the undersigned need address since the undersigned is not going to recommend a sanction which will, in effect, award judgment, full or partial, to the plaintiffs.

not imposing them on another. *See Wiseman v. Lipinski*, 2012 WL 928739 *2 (M.D. Tenn. Mar. 19, 2012) (imposing adverse inference jury instruction on defendant who had control over spoliated evidence while declining to do so for defendant who did not control spoliated evidence).

In the instant case, the video evidence is particularly important to the plaintiffs' case because of its credibility value in establishing a timeline of events before Clemons was transported to Erlanger on November 19, 2010. While the plaintiff and other inmates may be able to testify as to the Clemons' condition, what SDF staff was told and when, and the action taken by SDF staff on November 19, 2010; if the inmates' testimony diverges from the SDF staff's testimony, then the inmates will have greater credibility problems simply because they are inmates. The video had no such limitations; indeed, the video would have been crucial to the timeline of events. On the other hand, the video could not have established the cause of the child's death. According to CCA's expert, the child would have died even if Clemons had been transported hours earlier to the hospital because of the type of infection that Clemons had contracted. The video in no way could have provided evidence to rebut this type of testimony. In addition, while the video itself could have provided evidence regarding what SDF staff saw, knew, and did and at what time, whether this information should be interpreted as deliberate indifference to a serious medical need is within the province of the jury. On the other hand, an adverse inference jury instruction is still needed to level the evidentiary playing field on matters the video could have addressed, and CCA's gross negligence justifies a mandatory adverse inference. *See Beaven*, 622 F.3d at 553 ("an adverse inference for evidence spoliation is appropriate if the Defendants knew the evidence was relevant to some issue at trial and their

culpable conduct resulted in its loss or destruction" ) (internal citation omitted). Accordingly, the undersigned RECOMMENDS[3] the following:

(1) Instructing the jury that CCA was under a duty to preserve video evidence of the events which unfolded at SDF on November 19, 2010, that CCA failed to do so, that such failure constituted gross negligence, and that the jury should find the video evidence lost by CCA would have been unfavorable to CCA,

(2) Prohibiting CCA from offering any evidence or testimony from witnesses who viewed the now unavailable video footage, and

(3) Awarding plaintiffs' reasonable attorney's fees and costs to prosecute plaintiffs' motion for sanctions for spoliation of evidence.


S /William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).